PALATINE INSURANCE COMPANY, A CORPORATION, *Plaintiff in Error*, v. J. M. WHITFIELD, *Defendant in Error*.

Opinion Filed March 24, 1917.

1. Where the record shows that at the time of filing the bill of exceptions the plaintiff in error filed his complete assignment of errors, and both appear in the transcript of the record, it must be assumed in the absence of an affirmative showing to the contrary that an assignment of errors was presented to the judge with the bill of exceptions.

2. As the court should refuse to settle a bill of exceptions when no assignment of errors is presented therewith, it must be assumed in the absence of an affirmative showing to the contrary, that an assignment of errors was presented to the judge with the bill of exceptions.

3. The mere fact that the bill of exceptions duly authenticated contains no assignment of errors, is not conclusive that the same was not presented to the judge, even though Special Rule No. 1 of this court directs that the assignment of errors presented with the bill of exceptions shall be made a part thereof.

4. It is not a violation of the Iron Safe Clause of a fire insurance policy, for the insured not to keep his books and last inventory in a fire-proof safe, if he can produce them when demanded.

5. The provision in a fire insurance policy requiring the insured to "keep a complete set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit," is satisfied if the insured can produce them when demanded.

6. Where an insurance company intends to insist on a forfeiture clause of its policy, it should so inform the insured as soon as practicable after it ascertains the facts upon which it bases its claim for forfeiture.

7. The declaration in an insurance policy, that a violation of its provisions will cause it to become null and void, does not make it so, but the policy is voidable only.

8. A forfeiture clause in an insurance policy may be waived by the insurance company, and such waiver may be established by the acts and statements of its representatives.

9. The provisions of an insurance policy limiting or avoiding liability, are construed strictly against the insurer, and liberally in favor of the insured.

Writ of Error to Circuit Court for Jackson County; Cephas L. Wilson, Judge.

Judgment affirmed.

### Statement.

On May 17th, 1915, defendant in error brought suit in the Circuit Court of Jackson County against the Palatine Insurance Company.

The declaration is in the statutory form on a fire insurance policy.

The defendant filed eight pleas.

The first plea charges a breach of what is known as "The Iron Safe" clause, in that plaintiff did not take inventories as provided for in the policy.

The second plea charges violation of "Iron Safe Clause," in that plaintiff did not keep books, and did not produce the books for inspection of defendant, as required by the policy.

The third plea charges that plaintiff took out additional insurance without securing the agreement of the defendant and having same endorsed on the policy.

The fourth plea charges that plaintiff used gasoline on the premises where the property was insured, and no agreement of the defendant for him to do so was endorsed on the policy.

The fifth plea is to the same effect, except that it charges that plaintiff generated illuminating gas or vapor adjacent to the building described in the policy, and no agreement of the defendant for him to do so was endorsed in the policy.

The seventh plea charges that plaintiff did not give notice and furnish proofs of his loss within sixty days from the date of the fire.

The eighth plea is a traverse of the damages alleged.

The plaintiff filed replications to all but the eighth plea.

The replication to the 1st and 2nd pleas in substance sets up that the defendant sent an adjuster to Malone to investigate the orgin and extent of the fire, to whom plaintiff produced evidentiary data, invoices and books of account that were kept by the plaintiff in the usual course of business, which were accepted and used by the company's adjuster without objection, and thereafter before the institution of this suit offered plaintiff four hun-

dred and eighty-eight dollars for his loss on merchandise, and three hundred and twelve dollars for loss on furniture and fixtures, and did not deny the company's liability, nor object that the provisions of the policy had not been complied with, and thereby waived the defense sought to be made by these pleas.

The replication to the third plea in substance sets up that the same agent who issued and delivered the policy sued on, procured the additional insurance mentioned in this plea, with knowledge at the time that the policy sued on was then in force, and delivered to him the policy for such additional insurance, and consented to same and waived endorsement of same on the policy. That after the fire the company sent an adjuster to Malone to investigate the origin of the fire, the nature and extent of plaintiff's loss, and the defendant company's liability therefor, and thereafter offered to pay plaintiff four hundred and eighty-eight dollars in settlement of plaintiff's loss on his stock of merchandise, and did not deny its liability under the policy, and that the defense sought to be set up by this plea was thereby waived.

The replication to the fourth, fifth and sixth pleas in substance sets up that the property insured was situated in the plaintiff's drug store and was lighted by artificial gas generated in a tank outside the building, that the lighting apparatus was standard in design and installation, of a type approved by the National Board of Fire Underwriters, and permitted without extra charge by all Fire Companies writing business in the town of Malone, Florida, including the defendant, and that its use was known or should have been known by the defendant at the time of delivering the policy and accepting the premium therefor; that no gasoline was used, allowed or generated in

the store in which the insured articles were kept, or adjacent thereto, except the gasoline so used and allowed.

The replication to the seventh plea sets up that within sixty days after the fire the Insurance Company's adjuster came to Malone, and after investigation, and with full knowledge of the facts alleged in this plea, offered to pay the plaintiff eight hundred dollars in settlement of the liability, and did not then or at any time prior to the institution of the suit make any objection to paying the loss on the grounds set forth in this plea.

The defendant filed rejoinder to plaintiff's replication to the defendant's 1st, 2nd, 3rd and 7th pleas, and also filed demurrer thereto upon the gorunds that they are vague, indefinite, uncertain and insufficient; that the facts set up in the replication to the first and second pleas are insufficient to constitute a waiver; that an offer of compromise is insufficient as a waiver of the iron safe clause; that the facts set up in replication to third plea are not sufficient to constitute a waiver; that the replication fails to allege that the agent received knowledge of the additional insurance while acting as agent of defendant, or within the scope of his authority as such agent; and that the replication sets up two distinct matters by way of reply. The demurrer to the replication was overruled. The defendant for rejoinder sets up that before the Insurance Company's adjuster made any investigation of the loss, the plaintiff entered into an agreement in writing with the Insurance Company that any action or investigation on the part of the adjuster that relates to the claim of plaintiff for loss or damage, should not be a waiver of any of the conditions or requirements of the insurance policy.

To this rejoinder the plaintiff demurred on the grounds that it is vague, indefinite, uncertain and insufficient; that it is not alleged that there was any considera-

tion for the non-waiver agreement; that it is not alleged that the non-waiver agreement was entered into without notice on the part of defendant of the existence of the facts constituting a forfeiture of the policy; that the non-waiver agreement is simply declaratory of the non-waiver stipulation contained in the policy, and does not consti- tute a bar to the waiver created by defendant's adjuster proceeding to investigate the loss, and requiring plaintiff to submit proofs as to plaintiff's loss, and defendant's lia- bility.    The demurrer to the rejoinder being sustained, and the defendant having joined issue on the plaintiff's replication to the defendant's pleas, the case proceeded to trial, and resulted in a verdict and judgment for the plaintiff for two thousand dollars with interest, and twenty-five dollars and ten per cent for attorney's fees. A motion for a new trial having been denied by the trial judge, writ of error was sued out to this court.

There are nine assignments of error, as follows:

"1.    The court erred in overruling defendant's demur- rer to plaintiff's replication.

"2.    The court erred in sustaining plaintiff's demur- rer to defendant's rejoinder.

"3.    The court erred in admitting in evidence the two pages of the inventory amounting to $78.92 and $98.25, being various articles of jewelry.

"4.    The court erred in overruling defendant's motion to strike out the item of microscope $100.00 from plain- tiff's inventory in evidence.

"5.    The court erred in admitting in evidence the let- ter dated April 10th, 1915, signed by J. T. Dargan, Jr., addressed to Whitfield & Thomas, and in overruling de- fendant's objection to said letter.

"6.    The court erred in overruling defendant's mo- tion for new trial.

"7.   The court erred in overruling and refusing to give the second special instruction requested by the defendant.

"8.   The court erred in refusing to give the seventh special instruction requested by the defnedant.

"9.   The court erred in refusing to give the ninth special instruction requested by defendant."

*Paul Carter,* for Plaintiff in Error.

*John H. Carter,* for Defendant in Error.

BROWNE, C. J., (*after stating the facts.*) We are met at the outset with a proposition which is presented for the first time in the brief of the defendant in error.   It is contended that this court cannot consider any assignment which depends upon the bill of exceptions for support, for the reason that no assignment of errors is made a part of the bill of exceptions, nor does the bill purport to be predicated upon any assignment of errors, and Special Rule 1 of the Court is invoked in support of the contention that the bill of exceptions is a nullity.

It appears from the record that at the time of filing the bill of exceptions the plaintiff in error filed his complete assignment of errors and both appear in the transcript of the record, although the record does not say that at the time the plaintiff in error presented his bill of exceptions to the Circuit Judge he also presented to him his assignment of errors.

In Thomas Bros. Co. v. Price & Watson, 56 Fla. 694, 48 South. Rep. 17, the question here raised in the brief was squarely presented by a motion to strike the bill of exceptions and to dismiss the writ of error, and this court said:

"In this case it does not affirmatively appear from the
transcript that no assignment of errors was in fact pre-
sented to the judge with the bill of exceptions; and as the
court should refuse to settle the bill of exceptions when
no assignment of errors is presented therewith, it must
be assumed, in the absence of an affirmative showing to
the contrary, that an assignment of errors was presented
to the judge with the bill of exceptions, at least where as
in this case no exception was taken to the settlement of
the bill of exceptions on the ground that no assignment
of errors had been presented as required by the rule.

The mere fact that the bill of exceptions duly authen-
ticated contains no assignment of errors, is not conclusive
that none was presented to the judge, even though the rule
directs that the assignment of errors presented with the
bill of exceptions shall be made a part thereof.

The rule does not require that the transcript shall
show the service of a copy of the assignment of errors on
the defendant in error, and the directions to the clerk in
this case does not demand it.

The ground of the motion that no copy of the assign-
ment of errors was served on the defendants in error is
not self supporting and no evidence to sustain it is pre-
sented here. There is nothing to show that the bill of ex-
ceptions was not made up in pursuance of an assignment
of errors presented to the judge." This seems to dispose
of the contention of the defendant in error on this point.

The first assignment of error relates to the overruling
of the defendant's demurrer to the plaintiff's replication
to the first and second pleas, which set up a breach of the
iron safe clause. Allegations in the replication are ad-
mitted by the demurrer to be true, and even without the
allegation of the offer of the adjuster to pay eight hun-

dred dollars in settlement of the claim, the other allega-
tions state a sufficient compliance with the iron safe
clause of the policy, to put the parties to their proofs.
The replication states that on the request of the "ad-
juster" plaintiff "personally produced evidentiary data,
invoices and books of accounts that were kept by plain-
tiff in the usual course of business, from which the
amounts and value of said stock of merchandise at the
time of the fire could be reasonably ascertained." The
agreement in the policy which is known as the iron safe
clause requires that the insured "will take a complete in-
ventory of stock on hand at least once in each calendar
year," and "will keep a set of books, which shall clearly
and plainly present a complete record of business trans-
acted, including all purchases, sales and shipments, both
for cash and credit," and "will keep such books and in-
ventory * * * securely locked in a fire proof safe at night,
and at all times when the building mentioned in the pol-
icy is not open for business, or failing in this, the in-
sured will keep such books and inventories in some place
not exposed to a fire which would destroy the aforesaid
building." It is immaterial whether he kept the inven-
tories and books in a fire proof safe, or not, if he could
produce them when demanded, and the replication avers
that upon request of the insurance company's adjuster
the insured personally produced evidentiary data, in-
voices and books of account that were kept by him in the
usual course of business, from which the amount and
value of said stock of merchandise at the time of the fire
could be reasonably ascertained. It seems to us that this
is all the insurance company had a right to require, and
there is no error in this ruling of the lower court. In
construing a similar clause in an insurance policy, the
Supreme Court of the United States said:

"Turning now to the words of the policies in suit, what is the better and more reasonable interpretation of those provisions so far as they relate to the issues in this case? The convenent and agreement, 'to keep a set of books, showing a complete record of business transacted, including all purchases and sales, both for cash and credit, together with the last inventory of said business,' should not be interpreted to mean such books as would be kept by an expert bookkeeper or accountant in a large business house in a great city. That provision is satisfied if the books kept were such as would fairly show, to a man of ordinary intelligence, 'all purchases and sales, both for cash and credit.' There is no reason to suppose that the books of the plaintiff did not meet such a requirement.

"That of which the company most complains is that the insured did not produce the last inventory of their business, and remove the books and inventory from the fireproof safe in which they had been placed the night of the fire. It will be observed that the insured had the right to keep the books and inventory either in a fireproof safe or in some secure place not exposed to a fire that would destroy the house in which their business was conducted. But was it intended by the parties that the policy should become void unless the fireproof safe was one that was absolutely sufficient against every fire that might occur? We think not. If the safe was such as was commonly used, and such as, in the judgment of prudent men in the locality of the property insured, was sufficient, that was enough within the fair meaning of words of the policy. It cannot be supposed that more was intended. If the company contemplated the use of a safe perfect in all respects and capable of withstanding any fire, however extensive and fierce, it should have used words expressing

that thought." Liverpool & London & Globe Ins. Co. v. Kearney, 180 U. S. 132, 21 Sup. Ct. Rep. 326.

The second assignment is based on the court sustaining the demurrer to the defendant's rejoinder which sets up a non-waiver agreement as an avoidance of the replication dealing with the acts of the adjuster.

It seems that an adjuster of the Palatine Insurance Company went to the scene of the fire shortly after it occurred for the purpose of investigating and adjusting the loss; that before he began his work he had information about the gas generating machines; he obtained and made a memorandum of the address of the manufacturers, and proceeded with the adjustment without making any objection about its use by the plaintiff. He took the plaintiff's books of account, was furnished with duplicate invoices of goods bought since the last inventory; he spent part of two days in making the investigation, and before leaving he stated in reply to a question about plaintiff getting his money, that they were so crowded with business and had had so many fires, it would take full time. He did not tell the plaintiff that his policy had been forfeited. He made a very thorough investigation and was afforded every facility by the insured to ascertain the facts, and at no time during the part of two days that he was in Malone investigating and adjusting the loss did he disclaim liability under the policy.

On April 30, 1915, Mr. J. T. Dargan, Jr., on behalf of the Palatine Insurance Company and other companies which he represented, wrote to the plaintiff that he had just received definite instructions from the various companies interested in the loss, and offered to pay 40% of the respective policies in full settlement of his claim. They did not then deny liability, but merely stated that the offer was made in a spirit of compromise "without

either admitting or denying liability under the policy." This all goes to show that at no time before the institution of this suit did the insurance company treat the policy as void, and it ought not be heard to make that contention now.   If an insurance company intends to stand on a forfeiture clause of its policy, it should so inform the insured as soon as practicable after it ascertains the facts upon which it bases its claim of forfeiture.   In this case, after more than two months had elapsed, and after a full investigation and adjustment of the loss, and the insurance company had been acquainted with the result of its adjuster's investigation, they were not only silent about any claim of forfeiture, but sought to lull the insured to sleep by writing him that they neither admitted nor denied liability under the policy.

It seems to be settled in this State that notwithstanding the strong language used in an insurance policy to the effect that a violation of certain clauses therein will cause it to "become null and void," the policy is not void, but voidable, and that a forfeiture clause may be waived by the insurance company; and such waiver may be established by the acts and statements of the representatives of the Insurance Company.   Tillis v. Liverpool & L. & G. Ins. Co., 46 Fla. 268, 35 South. Rep. 171; Eagle Fire Ins. Co. v. Lewallen, 56 Fla. 246, 47 South. Rep. 947; Caledonian Ins. Co. v. Smith, 65 Fla. 429, 62 South. Rep 595.

It appears from the testimony that after having knowledge of the facts which might have constituted a forfeiture, the company proceeded to adjust the loss, and after its completion and after consultation with the company its representative offered to pay the insured six hundred and eighty-eight dollars for his loss on the stock of merchandise and three hundred and twelve dol-

lars for his loss on store furniture and fixtures. Both of these items were embraced in the policy sued on. The amount on the former was twelve hundred and twenty dollars, and on the latter seven hundred and eighty dollars. It is true that in the written offer of settlement, they state that the same is made "in a spirit of compromise;" but the fact that they make an offer to pay forty per cent of the amount of the policies, after a full investigation and adjudication of the loss, amounts to a waiver of any right to a forfeiture, and shows that the compromise they propose is in relation to what they think may be due, and not in compromise of any of the matters out of which a forfeiture could be claimed. As was said in Tillis v. Liverpool & L. & G. Ins. Co., *supra*, "If these acts do not constitute an express waiver, they could only have been done by virtue of the obligation of a valid policy, and therefore the company knowing of the forfeiture, by such act waived it, and are bound by such waiver. A non-waiver agreement may itself be waived. Pennsylvania Fire Ins. Co. v. Draper, 187 Ala. 103, 65 South. Rep. 923; Tillis v. Liverpool & L. & G. Ins. Co., 46 Fla. 268, 35 South. Rep. 171; Eagle Fire Co. v. Lewallen, 56 Fla. 246, 47 South. Rep. 947; Pennsylvania Fire Ins. Co. v. Hughes, 108 Fed. Rep. 497, 47 C. C. A. 459. In the latter case the court in discussing a non-waiver agreement said: "Like the forfeiture provisions of the policy, above referred to, if not more strictly, the language of this agreement should be construed strongly against the company, and liberally in favor of the accused."

The third and fourth assignments raise the question whether jewelry and a microscope of the aggregate value of $277.17 were covered by the policy. The clause in the policy reads: $1220.00 on stock of merchandise consisting

chiefly of drugs and such other merchandise, nor more hazardous, usual to trade." It is not necessary for us to decide whether or not these articles are such as are usual to a general drug store, because there is no provision in the policy limiting the nature of merchandise to such articles as are usual to the drug, or any other trade. The words "and such other merchandise not more hazardous, usual to trade," are printed, and there is a blank space before the word "trade," in which if the insurance company had desired to limit their liability for loss to drugs strictly, or to any other class of goods, they could have inserted the words of limitation. They did not do this, and under the policy the plaintiff could carry any article of merchandise usual "to trade." The plaintiff in error cannot complain that this construction is too technical, because in asking to have these articles excluded from those for the loss of which he would be liable, he is asking this court to be technical and construe the contract strictly against the insured, so as not to cover liability for loss of anything not peculiarly appertaining to the drug trade. In effect, he asks us first to construe the contract liberally in his favor, and infer that the "drug trade" was meant, and having done this, then to construe it strictly in his favor and exclude liability for anything not unquestionably included in that term. Such a construction would reverse the well settled rules of this and other States, that the provisions of a policy limiting or avoiding liability, are strictly construed against the insurer and liberally in favor of the insured." L'Engle v. Scottish Union & National Fire Ins. Co., 48 Fla. 82, 37 South. Rep. 462; Caledonian Ins. Co. v. Smith, 65 Fla. 429, 62 South. Rep. 595; Queen Ins. Co. v. Young, 86 Ala. 424, 5 South. Rep. 116; Loventhal v. Home Ins.

Co., 112 Ala. 108, 20 South. Rep. 419.   As there is no question that jewelry and a microscope are articles usual to trade, and the policy containing no words of limitation as to the kind of trade, we find no error in the ruling of the court in admitting evidence in relation to the loss of these articles.

The fifth assignment relates to the admission in evidence of a letter dated April 10th, signed by J. T. Dargan, Jr., addressed to Whitfield and Thomas upon the grounds that the proposition contained in the letter was merely an offer of compromise.   We have already covered that contention.   The introduction of the letter, however, was objected to upon the further grounds that it "related to a policy other than the policy in suit." This letter was from J. T. Dargan, Jr., who signed it as adjuster.   It is dated from "Southern Adjustment Bureau, Jacksonville, Florida, office, April 10. 1915."   The testimony shows that Mr. Dargan was one of the parties who went to Malone shortly after the fire and spent part of two days investigating and adjusting the loss.   It is true he says in this letter that the facts and circumstances of the claim have been duly submitted to the "British America Assurance Company" and no mention is made of the Palatine Insurance Company, the defendant below, but there was introduced in evidence another letter with same heading, and from the same party, dated April 30, 1915, with the caption "Re Claim-Stock drugs, store furniture and fixtures and soda fount, Malone, Flordia, Fire February 23rd, 1915, Connecticut Policy No. 1006, New York Underwriters Policy No. 20400 and Palatine Policy No. 50067," which says that "the Connecticut Fire Insurance Company, the New York Underwriters Agency, and the Palatine Insur-

ance Company are willing, in a spirit of compromise through either admitting or denying liability under their several policies above mentioned and more particularly reserving all rights and defenses which they may have thereunder, to pay in final settlement 40% of the amounts of their respective policies. This, you will note, permits the payment under stock item of $698.00 under furniture and fixture item of $312.00 and under item covering soda fount of $400.00." This letter is in almost the same phraseology as the one of April 10th, and contains the same offer, and is on the same subject. No objection was made to the introduction of this letter, and as there was nothing in the letter of April 10th, that was not fully covered in the letter of April 30th, no harm could come from the introduction of the former, and if error was committed by the lower court in permitting its introduction, it was harmless error, and no ground for reversal.

The sixth assignment relates to the denial of the defendant's motion for a new trial. The third to the eighth grounds of the motion relate to the charges of the court, and present a very serious question, and if the charges had not been subsequently corrected would have been reversible error. The Circuit Judge was very specific in giving these charges; he read the first, second and third pleas in full, but before doing so he charged that "the burden of proof is upon the defendant to prove these pleas after the plaintiff has proven the contract of the insurance and the loss under it; then defendant must prove by a preponderance of the evidence these pleas which undertake to set up a forfeiture of the contract." After reading the first, second, third and fourth pleas the Circuit Judge charged in each instance that the burden of proof was on

the defendant to prove his pleas by a preponderance of the evidence. He then charged that there were then other pleas similar to the fourth, which there was no necessity to read, but to each of them he charged that the burden was on the defendant to prove them by a preponderance of the evidence. He read the seventh plea to the jury and charged them that the burden of proving the plea by a preponderance of the evidence rests upon the defendant. Before completing his charge the Judge corrected the error of these charges in the following language: "Gentlemen of the jury, the Court desires to correct a part of the charge first given you by charging you that the burden of proof in this case is upon the plaintiff to prove his replications to the pleas of the defendant, and not upon the defendant to first prove its pleas, because the pleas are practically confessed by plaintiff's replication, and if the plaintiff has proved his replications, or any of them, by a preponderance of the evidence, then he has successfully avoided the force and effect of such pleas to which he has filed and proven his replications, and you would find for the plaintiff upon such plea or pleas."

This court realizes that harm may be done a litigant by a trial judge in erroneous charges emphatically and specifically given, the effect of which may not be entirely remedied by a correction in a few words at the end of the charge, but we think there was no such error in this instance as to warrant a reversal upon that ground alone.

The tenth ground in the motion for a new trial is the refusal of the trial judge to give the following charge: "I charge you that if in this case the adjuster of the Insurance Company called upon the plaintiff for the inventory and the plaintiff, Mr. Whitfield, or Mrs. Whitfield acting

for him, stated that the inventory was lost or destroyed, and failed to produce same, and has never produced it for the inspection of the insurance company, and then the adjusters merely looked at the ledger entries of the plaintiff as to the amount of goods on hand, and did not request of plaintiff duplicate bills as to the goods, or put him to other expense or trouble, there would be no waiver as to the goods and you should find a verdict for the insurance company as to the insurance on goods amounting to $1,220.00."

This charge did not fully and correctly state the facts in connection with this transaction, and was not applicable to them and was properly refused.

The twelfth ground of the motion for a new trial is the refusal of the trial judge to give the following charge: "There would be no waiver of the provision requiring the production of the inventory, if the acts done by the defendant's adjusters, relied on as a waiver were induced by the statements of the plaintiff, that the inventory was burned or lost and in fact it was not so burned." The testimony in this case does not sustain the inferences and conclusions of fact recited in this charge. There is nothing to show that the acts done by the defendant's adjusters were induced by the statements of the plaintiff that the inventory was burned. Mr. Whitfield testified: "I did not tell Mr. Von Hasselen that I didn't have an inventory at all. No, sir, I did not tell him that I had made an inventory but that the inventory was burned and I couldn't produce an inventory. I told him we couldn't produce the original invoices. I did not show him the inventory on this book here that I am showing you. He wasn't asking for anything at that time, that was on the day when he took, I don't know what you call it, it was before the

other fellow was there." Mr. Von Hassellen, the defendant's adjuster, testified: "I visited Malone representing this Insurance Company shortly after the fire. I saw Mr. Whitfield, the plaintiff here, when I was in Malone. I did not demand production of the inventory required by the policy. I asked him if he had it. He said he did not have it. I asked him about his books, whether or not he had kept his books according to the iron safe clause. He said he had, said he had a record of his purchases and his sales. He said he did not have the inventory.

### CROSS EXAMINATION.

"I believe I explained to him what I meant by inventory. There is only one meaning to an inventory. I asked him if he had his last inventory. He did not show me the amount of it on his ledger. He showed it to Dargan. Mr. Dargan is an adjuster for this company. He was there for the purpose of investigating this loss, the same as I was, we were working together. I do not remember the kind of book he showed Mr. Dargan. I did not see the book." This is the entire testimony of Mr. Von Hasselen. The other adjuster, Mr. Dargan, was not called as a witness. There is no contention that the plaintiff did not take an inventory as provided for in the policy. Mrs. Whitfield and Mr. Whitfield testified fully as to the taking of the inventory which was begun about the 12th of January, 1915, and ended on the 28th of that month. The fire occurred February 23, 1915. The inventory was produced in court and exhibited in evidence. We find no error in refusing this charge.

The grounds in the motion for a new trial that the verdict was contrary to law, and contrary to the evidence

are disposed of in the discussion of the other questions raised by the assignments of error.

We find no reversible error in the record, and the judgment of the lower court is affirmed.

TAYLOR, SHACKLEFORD, WHITFIELD and ELLIS, JJ., concur.